Richard D. McCune (State Bar No. 132124)
rdm@mccunewright.com
David C. Wright (State Bar No. 177468)
dcw@mccunewright.com
Mark I. Richards (State Bar No. 321252)
mir@mccunewright.com
MCCUNE WRIGHT AREVALO, LLP
3281 East Guasti Road, Suite 100
Ontario, California 91761
Telephone: (909) 557-1250
Facsimile: (909) 557-1275

Derek Y. Brandt (*Pro Hac Vice*)
dyb@mccunewright.com
Leigh M. Perica (*Pro Hac Vice*)
lmp@mccunewright.com
MCCUNE WRIGHT AREVALO, LLP
231 North Main Street, Suite 20
Edwardsville, IL 62025
Telephone: (618) 307-6116
Facsimile: 618-307-6161

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NAOMI WILSON and KYLE SWARTS,<br><br>Plaintiffs,<br><br>  v.<br><br>KIA MOTORS CORPORATION, KIA MOTORS AMERICA, INC., and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No.: 8:19-cv-01069-JLS-JDE<br><br>**SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>1. Violation of California Bus. & Prof. Code § 17500, *et seq.;*<br>2. Violation of Cal. Bus. & Prof. Code § 17200, *et seq.;* |

3. Violation of Cal. Civ. Code § 1791, *et seq.;*
4. Violation of Missouri Merchandising Practices Act
5. Breach of Implied Warranty.

NOW COME Plaintiffs Naomi Wilson and Kyle Swarts (herein after "Plaintiffs") with knowledge as to their own actions and events, and upon information and belief as to other matters, allege as follows:

## I

## NATURE OF THE ACTION[1]

1.     Several of the most popular vehicle models from Defendants collectively referred to as "Kia"— Kia Motors Corporation and Kia Motors America, Inc.— suffer from a potentially catastrophic engine defect leading to spontaneous engine fires and/or sudden catastrophic engine failure while in motion. The Engine Defect poses a risk of accidents, bodily injury or death for both drivers and passengers, and extensive vehicle damage. According to the National Highway Traffic Safety Administration (NHTSA), engine failure and fire problems have affected millions of Kia vehicles and continue to affect Kia Vehicles to this day.

2.     To benefit the bottom line, Kia  concealed the serious engine defect in their popular vehicle models equipped with gasoline direct-injection ("GDI") engines and multipoint fuel injection  ("MPI") engines. GDI engines were first introduced to the U.S. market in 2009. In recent years, there have been widespread reports of Kia vehicles,

---

[1] The substantive allegations of this Second Amended Complaint are as originally alleged from the First Amended Complaint filed on October 21, 2019 [ECF No. 25]. Plaintiffs Kyle Swarts and Naomi Wilson were added to this action at the time of filing the First Amended Complaint. This SAC comes after the stay pending resolution of *In re: Kia Engine Litigation, 8:17-cv-00838-JLS-JDE* ended, and Plaintiffs' factual allegations in this SAC are as originally alleged in the FAC.  Accordingly, references to documents investigations and timeframes, are references to those as they existed *status quo ante* at the time of the FAC filing.

equipped with a GDI or MPI engine, bursting into flames. Kia has also documented more thousands of fire-related incidents that were not sparked by a collision, and consumer complaints of melted wires in the engine bay, engine smoke, rattling metal noises and burning odors emanating.[2] Following the recalls and settlement of *In re: Kia Engine Litigation*, 8:17-cv-00838-JLS-JDE, additional vehicles at risk include Plaintiffs' 2012 Kia Optima Hybrid and 2016 Kia Soul. [3]

3.     Federal prosecutors have since launched a criminal investigation into Kia to determine if the vehicle recalls had been conducted properly.[4] However, numerous at-risk Kia vehicles are still on the road. Following thousands of reported fires, more than 103 injuries, and one recorded fatality involving Kia vehicles, federal officials called for an NHTSA investigation into the non-collision fires.[5]  In April 2019, NHTSA launched its formal investigation into fires in two Kia vehicle models: 2011-2014 Kia Optima and Sorento, and the 2010-2015 Kia Soul.[6] A group of U.S. states are also investigating Kia for

---

[2] Francesca Paris, *Federal Auto Regulator To Investigate Hyundai, Kia Vehicle Fires* (April 2, 2019), NPR, available at https://www.npr.org/2019/04/02/708986625/federal-auto-regulator-to-investigate-hyundai-kia-vehicle-fires (last accessed August 16, 2021)

[3] Clifford Athiyeh, *Hyundai and Kia Recall 1.2 Million Cars for Engine Failures* (April 7, 2017), Car and Driver, available at https://www.caranddriver.com/news/a15342058/hyundai-and-kia-recall-1-2-million-cars-for-engine-failures/ (last accessed August 16, 2021); Alexander Stoklosa, *Hyundai Recalling 569,500 Sonatas, Accents Over Separate Defects*, (September 25, 2015), Car and Driver, available at

[4] David Shepardson, *U.S. to probe thousands of fires connected to Hyundai, Kia vehicles,* Reuters, available at https://www.reuters.com/article/us-hyundai-motor-probe/u-s-to-probe-thousands-of-fires-connected-to-hyundai-kia-vehicles-idUSKCN1RD2P4  (last accessed August 16, 2021)

[5] Jeff Plungis, *Hyundai and Kia Models Suffer Alarming Number of Fires, Watchdog Group Says* (June 13, 2018), Consumer Reports, available at https://www.consumerreports.org/car-recalls-defects/hyundai-and-kia-fires-center-for-auto-safety/ (last accessed April 16, 2019)

[6] *NHTSA Safety Defect/Noncompliance Notices Received During February 2019* (April 4, 2019), available at  https://www.odi.nhtsa.dot.gov/downloads/monthlyReports/rcl/RCLMTY-022019-1234.pdf  (last accessed April 12, 2019); *ODI Resume-2011-2014 Kia Optima and Sorento; and 2010-2015 Kia Soul* (Mar. 29, 2019), available at  https://static.nhtsa.gov/odi/inv/2019/INOA-PE19004-4727.PDF  (last accessed April 12, 2019); *ODI Resume- 2011-2014 Hyundai Sonata and Santa Fe* (Mar. 29, 2019), available at  https://static.nhtsa.gov/odi/inv/2019/INOA-PE19003-2613.PDF  (last accessed April 12, 2019).

SECOND AMENDED COMPLAINT

unfair and deceptive acts related to the non-collision fires.[7] The investigations do not stop at the United States border. South Korean prosecutors are also conducting investigations into the automakers over its engine recalls.

4.      Simply put, Kia should have acted to recall their vehicles far earlier. Moreover, their repair work, and that recommended to its dealerships, should have been better performed to prevent this Engine Defect and repeated problems resulting therefrom. To the extent Kia did recall vehicles, such recalls should have been more inclusive to account for additional Kia vehicles at risk for the Engine Defect, including those models purchased by Plaintiffs.

5.      To the extent Kia issued limited recalls and said recalls did not rectify the Engine Defect, this amounts to a misrepresentation: Kia issued recall notices representing that it would fix the Engine Defect. However, the recall did not adequately fix the problem, and Kia knew or should have known of the ineffective nature of their recalls.

6.       Not only do the numerous investigations, publications, consumer complaints and internet postings put Kia on notice of the Engine Defect, but Kia concealed from consumers the defect and related safety hazards, thus misleading and inducing consumers to purchase and continue driving potentially unsafe vehicles.

7.      Kia routinely implements two warranties applicable to its vehicles, including Plaintiffs' Vehicles: "New Vehicle Limited Warranty," and "Powertrain Warranty." Under the "New Vehicle Limited Warranty," Defendants agree to repair defects reported within the earlier of 5 years or 60,000 miles. Under the Powertrain Warranty, Defendants agree to repair defects affecting various powertrain components through 10 years or 100,000 miles.

8.      The catastrophic engine failure and fire risk is the direct result of the Engine Defect known to, concealed by, and unremedied by Kia, which may manifest itself before

---

[7] David Shepardson, *U.S. to probe thousands of fires connected to Hyundai, Kia vehicles,* Reuters, available at https://www.reuters.com/article/us-hyundai-motor-probe/u-s-to-probe-thousands-of-fires-connected-to-hyundai-kia-vehicles-idUSKCN1RD2P4 (last accessed April 12, 2019)

or after a warranty lapses. As a result of the Engine Defect, Plaintiffs were exposed to an unreasonable risk of financial injury, physical injury or death when their vehicle's engine spontaneously ignited and/or smoked. The engine defect also exposes passengers and drivers on the roadways, including rideshares to an unreasonable and increased risk of accident, injury, or death.

9.    Therefore, Plaintiffs bring this action for reimbursement requiring Kia to make them whole for all costs, inconveniences and economic losses associated with their engine fires, and damages in an amount to be determined at trial, pursuant to the Unfair Business Practices Act, California Business & Professions Code § 17200, *et seq.*; and Song-Beverly Act, §§ 1792, 1791.1, *et seq.*; and Mo. Rev. Stat. § 407.010, *et seq.*

## II
## PARTIES

### A.    Plaintiffs

10.    Plaintiff Naomi Wilson is a citizen of the State of California currently residing in Simi Valley, CA. Wilson purchased a new 2012 Kia Optima Hybrid, equipped with a 2.4-liter Theta II Multi Point Injection (MPI) engine, with VIN number KNAGM4AD5C5009566 from a Kia dealership in Simi Valley, CA. She regularly complied with Kia's suggested maintenance and recalls and took her vehicle in for service of her engine on numerous occasions. However, on or about April 9, 2019, Ms. Wilson was driving her vehicle when an engine fire erupted forcing her to evacuate the vehicle. Ms. Wilson's spontaneous engine fire was the result of the Engine Defect. Ms. Wilson has suffered an ascertainable loss as a result of Defendants' omissions and/or misrepresentations associated with the engine defect, including, but not limited to, out of pocket losses associated with the engine defect, including her insurance deductible, and other consequential damages. Had Defendants disclosed the safety-related defect and risk of fire and catastrophic engine failure at the time of purchase, Plaintiff would not have purchased the vehicle, or would have paid significantly less for it.

11.     Plaintiff Kyle Swarts is a citizen of the State of Missouri currently residing in Missouri. Plaintiff purchased a used 2016 Kia Soul that was equipped with a GDI engine in or around St. Charles, MO in March 2017.  Thereafter, in or around August 2017, Plaintiff's engine caught fire as a result of the Engine Defect. Plaintiff has suffered an ascertainable loss as a result of Defendants' omissions and/or misrepresentations associated with the engine defect, including, but not limited to, out of pocket losses associated with the engine defect. Had Defendants disclosed the safety-related defect and risk of fire and catastrophic engine failure at the time of purchase, Plaintiff would not have purchased the vehicle, or would have paid significantly less for it.

## B. Defendant KIA MOTORS CORPORATION

12.     Defendant Kia Motors Corporation ("Kia Corp.") is a South Korean multinational automaker headquartered in Seoul, South Korea. Kia Corp. is principally engaged in the manufacture and distribution of automobiles. Kia Corp.'s products include passenger vehicles, recreational vehicles, taxi/bus/commercial vehicles as well as hybrid vehicles under the brand names of Cadenza, Forte, Forte Koup, Forte 5, K900, Optima, Optima Hybrid, Rio, Rio 5-door, Soul, Sedona, Sorento, Sportage and others.

13.     The Company also engaged in the manufacture of automobile components, as well as prevision of rental and maintenance services. The Company distributes its products within domestic market and to overseas markets, such as North America, Europe and other Asian countries.

14.     Kia Corp. is the parent corporation of Kia Motors America, Inc. As of April 2019, Defendant Kia Corp.'s  largest shareholder is Hyundai Co., which holds 33.88 percent of Kia Corp.'s stock.

## C. Defendant KIA MOTORS America, Inc.

15.     Defendant Kia Motors America, Inc. ("Kia America") is an automobile design, manufacturing, distribution, and/or service corporation doing business within the United States. Kia America designs, develops, manufactures, distributes, markets, sells, leases, warrants, services, and repairs passenger vehicles, including the Kia Vehicles.

16.     Kia America is incorporated and headquartered in the state of California with its principal place of business at 111 Peters Canyon Road, Irvine, California 92606. Kia America serves as the American sales, marketing, and distribution arm of its parent company, Kia Corp., overseeing sales and other operations across the United States. Kia America distributes and sells a complete line of Kia vehicles through more than 755 dealers throughout the United States. Money received from the purchase or lease of a Kia vehicle from a dealership flows from the dealer to Kia America and Kia Corp (together, "Kia").

17.     On information and belief, Defendant Kia America is responsible for the distribution, service, repair, installation, and decisions regarding the GDI and MPI engines as they relate to the Engine Defect in the Kia Vehicles.

18.     On information and belief, Defendant Kia America developed the post-purchase owner's manuals, warranty booklets, and other information related to maintenance recommendations and/or schedules for the Kia Vehicles.

19.     Kia America engages in substantial and continuous business in the state of California.

**D. Doe Defendants**

20.     Doe Defendants 1 through 50 represent presently unknown designers, researchers, developers, manufacturers, marketers, distributers, promoters, suppliers and sellers of Plaintiffs' Vehicles, which are defective and unreasonably dangerous.

### III

### JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. This Court also has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

22.     This Court has personal jurisdiction over Defendants by virtue of them doing business in this Judicial District and because Defendants are headquartered in California. Defendants have also engaged in statutory violations within the State of California and this District.

23.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391. Defendants have conducted, and continue to conduct, business in this District, and a substantial part of the acts and omissions giving rise to the claims occurred, at least in part, within this District. Defendants are headquartered here, maintain a manufacturing plant here, market, advertise, and sell the affected vehicles here at Defendants' dealerships , and otherwise conducted extensive business, within this District.

## IV

## FACTUAL ALLEGATIONS

24.    Kia manufactured and sold millions of vehicles equipped with defective engines that create major safety concerns for Plaintiffs and their passengers. Upon learning of the defect, Kia failed to remedy the potentially fatal defect, and in fact, concealed the true nature of the engines. Even after certain engine models were recalled, Kia failed to timely recall other models at risk for the same Engine Defect, including Plaintiffs' vehicles.

**A. GDI and MPI Engines**

25.    Kia debuted a new GDI engine to its lineup, the "Nu" 2.0-liter model in 2013.  Although first introduced in a 1.8-liter size in 2010, the Nu GDI engine line expanded in 2012 to include the 2.0-liter version. On information and belief, Kia used the Nu 2.0-liter GDI engines in certain Soul vehicles.

26.    Defendants also manufacture and use a 2.4-liter Theta II MPI engine. On information and belief, Kia used these Theta II MPI engines in certain Optima Hybrid, Sportage, Sorento, Forte, and Forte Koup vehicles.

**B.    The Engine Defect**

27.    Despite recalling hundreds of thousands vehicles in two recalls intended to address the catastrophic engine failure issue present in various models of GDI engines, Kia failed to recall millions of vehicles with potentially defective GDI engines that may catch

fire since the discovery of the engine defect in 2015 . [8] In fact, the Highway Loss Data Institute, reported Kia vehicles with two-liter, turbocharged engines were more than three times more likely to catch fire than engines in any other similar-sized vehicle on U.S. roads. Yet not all models with that engine have been recalled. [9]

28.    The defect reported in the "Theta II" engines causes debris to be spewed from the engine resulting in prematurely worn bearings, engine seizures, and/or dislodged connecting rods that may puncture the engine block. This defect, which is present in other GDI and MPI models, like those driven by Plaintiffs, restricts oil flow to essential component parts of the engine, resulting in inadequate engine oil lubrication. Stalling may be triggered by the premature engine wear resulting from inadequate lubrication and restricted oil flow to the engine.  Simply put, the defect damages the engine block, thus rendering the vehicles inoperable, and in many instances leading to engine fires.

29.    Premature wear may result in a connecting rod breaking and puncturing a hole in the engine block, thus allowing  oil to escape and encounter hot engine surfaces. This can ultimately cause a sudden engine fire rendering Plaintiffs' vehicles inoperable.[10]

30.    Subsequent to the previous engine recalls  mentioned above, in January 2019, following additional consumer complaints, Kia announced that it would recall vehicles to inspect  the high-pressure fuel pipe that may have been damaged, misaligned or improperly tightened while vehicle engines were being replaced under previous recalls. The damage can allow fuel to leak and hit hot engine parts, causing fires.

---

[8] *Center for Auto Safety: Investigation needed into Kia and Hyundai for hundreds of car fires,* (February 27, 2019) Center for Auto Safety, available at https://www.autosafety.org/wp-content/uploads/2019/02/CAS-letter-to-Congress-on-Kia-Hyundai-fires-Final.pdf (last visited April 20, 2019).
[9] Jackie Callaway, *Study: Certain Kia and Hyundai engines more likely to catch fire*, (March 25, 2019),ABC Action News,  https://www.abcactionnews.com/news/local-news/i-team-investigates/study-certain-kia-and-hyundai-engines-more-likely-to-catch-fire (last visited April 24, 2019).
[10] *Id.*

31.    Kia recently did recall its Soul due to fire and engine failure problems. However, the recent recalls are still insufficient to remedy the problem, given that Kia has yet to recall all vehicles at risk.

32.    On information and belief, Plaintiffs' vehicles were equipped with GDI or MPI engines of various models containing/at risk for the Engine Defect, thus drastically increasing the likelihood of catastrophic engine failures and engine fires.

### C.    Kia Failed to Efficiently Remedy the Known Engine Defect

33.    Instead of presenting the public with a solution for the Engine Defect, or at the very least, a suitable explanation or statement claiming responsibility for the continued sale of these defective engines, Kia recalled fewer than 10% of the potential fire prone vehicles as of February 27, 2019.[11]

34.    In the Center for Auto Safety ("the Center") February 27, 2019 letter to Congress, the Center stated that "Kia [was] refusing to fix a potentially deadly problem with their vehicles, despite independent analysis confirming that this is not a common occurrence for other manufacturers."[12]

35.    By the end of February 2019, the Center reported "over 300 'non-collision' fires in just 5 makes and models of [Hyundai and Kia's] vehicles over a small period of time." [13]. The Center went on to warn that "these figures are far out of proportion with similar size and class vehicles made during the same period", ultimately leading the Center to call for Congressional action. The Center ultimately called for a full recall of all 2011-2014 Kia Optima, Kia Sorento, and all 2010-2015 Kia Souls, and petitioned NHTSA to open an investigation into the issue.

---

[11] *Center for Auto Safety: It is Time for Congress to Take Action on Kia and Hyundai Fires,* (February 27, 2019) Center for Auto Safety, available at https://www.autosafety.org/wp-content/uploads/2019/02/CAS-letter-to-Congress-on-Kia-Hyundai-fires-Final.pdf (last accessed April 18, 2019).
[12] *Id.*
[13] *Center for Auto Safety: It is Time for Congress to Take Action on Kia and Hyundai Fires,* (February 27, 2019) Center for Auto Safety, available at https://www.autosafety.org/wp-content/uploads/2019/02/CAS-letter-to-Congress-on-Kia-Hyundai-fires-Final.pdf (last accessed April 18, 2019).

36.     On April 1, 2019—based on the hundreds of consumer complaints reporting Kia vehicles bursting into flames— NHTSA called for an investigation into the non-collision fires and the hundreds of further complaints noting melted wires in the engine bay, engine smoke, and burning odors emanating from Kia vehicles.  Kia remains under investigation by NHTSA for their alleged concealment of, and unhurriedness to fix, defective Kia vehicles, all the while Plaintiffs were left without recourse for their purchase or lease of their defective vehicles.

37.     In December 2020, Kia finally recalled Plaintiffs' vehicles under Recall Nos. 20V750000 (Kia) for the same Engine Defect plaguing other vehicles that were the subject of NHTSA's investigations and recalled earlier.

38.     Kia's Recall No. 20V750000 included 294,756 vehicles across six models (2012-2013 Sorento, 2012-2015 Forte and Forte Koup, 2011-2013 Optima Hybrid, 2014-2015 Soul, and 2012 Sportage vehicles) that are equipped with 2.4-liter Theta II MPI and 2.0-liter Nu GDI engines manufactured between February 2011 and May 2015 at unspecified plants or the Kia Hwasung Plant. Kia's associated NHTSA filings indicate all vehicles from this recall were determined through a review of vehicle production records.

**D. Kia Knew of the Engine Defect**

39.     Upon information and belief, Kia regularly monitors the NHSTA databases as part of its ongoing obligation to identify potential defect in their vehicles. Examples of the complaints about Plaintiffs' vehicles can be found below. NHTSA complaints establish that Kia knew, or should have known, of the engine defect at least as early as October, 2011, based on publicly available information, well before Plaintiffs purchased their vehicles through (1) Defendants' own records of customers' complaints, (2) dealership repair records, (3) records from NHTSA, (4) warranty and post-warranty claims, (5) pre-sale durability testing and part sales, and (6) other various sources.

40.     The experiences of the Plaintiffs are not isolated or outlying occurrences. The internet is also replete with examples of blogs and other websites where consumers have complained of the exact same engine defect. Upon information and belief, Kia, through (1)

their own records of customers' complaints, (2) dealership repair records, (3) records from the National Highway Traffic Safety Administration ("NHTSA"), (4) warranty and post-warranty claims, (5) internal pre-sale durability testing, and (6) other various sources, were well aware of the engine defect but failed to notify consumers of the nature and extent of the problems with the GDI Engines or provide any adequate remedy.

41.    Kia routinely monitors the internet for complaints similar in substance to those quoted below. Defendants' customer relations departments routinely monitor the internet for customer complaints, and Defendants have retained the services of third parties to do the same. Further, the customer relations divisions regularly receive and respond to customer calls concerning, *inter alia*, product defects. Through these sources, Kia was made aware of the engine defect. Customer complaints also indicate Defendants' knowledge of the defect and its potential danger.

42.    Kia is experienced in the design and manufacture of consumer vehicles. As an experienced manufacturer, Kia likely conducts testing on incoming batches of components, including the GDI and MPI Engines, to verify that the parts are free from defects and comply with Kia's specifications. Accordingly, Defendants knew or should have known that the engines used in the Plaintiffs' vehicles are defective and likely to fail prematurely, costing Plaintiffs thousands of dollars in expenses.

43.    Moreover, Kia also should have known of the Engine Defect because of the sheer number of reports of engine fires. For instance, Kia's customer relations department, which interacts with Kia-authorized service technicians in order to identify potentially widespread vehicle problems and assist in the diagnosis of vehicle issues, has received numerous reports of engine problems relating to the connecting rod bearings and lubrication channels. Customer relations also collects and analyzes field data including, but not limited to, repair requests made at dealerships and service centers, technical reports prepared by engineers that have reviewed vehicles for which warranty coverage is requested, parts sales reports, and warranty claims data.

44.    Kia's warranty department similarly reviews and analyzes warranty data submitted by their dealerships and authorized technicians in order to identify defect trends in their vehicles. Kia dictates that when a repair is made under warranty (or warranty coverage is requested), service centers must provide Kia with detailed documentation of the problem and the fix that describes the complaint, cause, and correction, and also save the broken part in case Defendants later decide to audit a dealership or otherwise verify the warranty repair. For their part, service centers are meticulous about providing this detailed information about in-warranty repairs to Kia because they will not pay the service centers for the repair if the complaint, cause, and correction are not sufficiently described.

45.    Kia knew or should have known about the Engine Defect because of the high number of replacement parts likely ordered from Kia. Upon information and belief, all Kia service centers are required to order replacement parts, including engine components, directly from Defendants. Other independent vehicle repair shops that service Kia vehicles also order replacement parts directly from Kia. Kia routinely monitors part sales reports and is responsible for shipping parts requested by dealerships and technicians. Thus, Kia had detailed, accurate, and real-time data regarding the number and frequency of replacement engine part orders. The sudden increase in orders for the GDI Engines and engine components, including those used in Plaintiffs' vehicle models, was known to Kia and should have alerted it to the scope and severity of the engine defect.

46.    Numerous other websites also list consumer complaints of the exact same engine defect within Kia vehicles with the same engines as those in Plaintiffs' Vehicles.

47.    Representative examples of complaints on the NHTSA website regarding Plaintiff's Kia vehicles with the defective GDI and MPI Engines are included below:[14]

Vehicle: 2012 Kia Optima Hybrid
Date of Incident: 08/28/2016
Date Reported: 10/16/2016

_____

[14] The complaints reproduced are as they appear on the NHTSA website. Any typographical errors are attributable to the original author of the NHTSA complaint.

NHTSA ID Number: 10914540

**SUMMARY:**

TL* THE CONTACT OWNED A 2012 KIA OPTIMA HYBRID. WHILE DRIVING APPROXIMATELY 60 MPH, THE CONTACT HEARD AN ABNORMAL BANGING NOISE UNDER THE HOOD. THE VEHICLE MOMENTARILY LOST POWER AND THE CONTACT NOTICED BLACK SMOKE AND FLAMES COMING FROM THE ENGINE COMPARTMENT. THE FIRE DEPARTMENT EXTINGUISHED THE FIRE. THE VEHICLE WAS TOWED TO THE DEALER WHERE IT WAS DEEMED DESTROYED. THE TECHNICIAN STATED THAT THE FIRE WAS DUE TO A CONNECTING ROD MALFUNCTION. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS APPROXIMATELY 87,000.

Vehicle: 2016 Kia Soul
Date of Incident: 11/19/2017
Date Reported: 11/21/2018
NHTSA ID Number: 11153156

**SUMMARY:**

I WAS GETTING READY TO MERGE ONTO THE INTERSTATE WHEN I HEARD NOISE COMING FROM THE ENGINE COMPARTMENT. WHEN I GOT ONTO THE INTERSTATE THE CAR WOULD NOT ACCELERATE, SO I PULLED OVER TO THE SHOULDER, AND THE ENGINE DIED. SMOKE WAS COMING FROM UNDER THE HOOD, AND TWO MEN IN TWO VEHICLES STOPPED AND OPENED THE HOOD AND FLAMES WERE COMING OUT FROM UNDER THE HOOD. THEY HAD WATER AND A FIRE EXTINGUISHER AND ALSO THREW SOME DIRT ON THE FIRE TO PUT IT OUT. THE VEHICLE WAS TOWED TO THE KIA DEALERSHIP WHERE IT WAS BOUGHT. THE INSURANCE COMPANY HAD THE KIA SOUL TOWED TO DENVER COLORADO TO HAVE THEIR AGENT LOOK IT THE KIA. IT WAS DECLARED A TOTAL LOSS AND WAS NOT AN ARSON FIRE. THE KIA DEALERSHIP FROM WHICH THE KIA SOUL WAS BOUGHT NEVER INSPECTED THE SOUL. ALL ROUTINE MAINTENANCE WAS DONE ON SCHEDULE BY THE KIA DEALERSHIP FOR THE 9 MONTHS I OWNED THE KIA. IT WAS BOUGHT NEW IN DECEMBER OF 2016 AND CAUGHT FIRE IN SEPTEMBER OF 2017.

THE CAUSE OF THE FIRE WAS NEVER DETERMINED AND KIA NEVER TOOK ANY RESPONSIBLE.

## V

## EQUITABLE TOLLING

**A. All Applicable Statutes of Limitations Were Tolled by Operation of the Discovery Rule.**

48.     Plaintiffs did not, and could not, have discovered through the exercise of reasonable diligence, the existence of the undisclosed Engine Defect,  as alleged herein.

49.     Plaintiffs did not, and could not, have discovered through the exercise of reasonable diligence, Kia's deception relating to the undisclosed Engine Defect affecting their vehicles, as alleged herein.

50.     Plaintiffs could not have discovered through the exercise of reasonable diligence that Kia was concealing the defect alleged herein until the NHTSA recall campaign was triggered by an alarming number of consumer complaints and a survey by the Center for Auto Safety, revealing the perilous scheme to the public.

51.     Until Plaintiffs  experienced a catastrophic engine fire, Plaintiffs and had no reason to discover the defect alleged herein, and upon experiencing such a failure, had no reason to discover the existence of a widespread defect among other Kia vehicles, or any effort to conceal the defect.

52.     Plaintiffs therefore did not discover, and did not know of, facts that would lead a reasonable person to suspect that Kia concealed information about a defect in their vehicles until shortly before this action was filed.

53.     Thus, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims relating to the Engine Defect in Plaintiff's vehicles in all states recognizing the discovery rule.

**B.     All Applicable Statutes of Limitations Have Been Tolled by Defendants' Fraudulent Concealment.**

54.     All applicable statutes of limitation have also been tolled by way of Defendants' knowledge and ongoing fraudulent concealment of the facts alleged herein dating back to at least 2017. Jason Vaughn, a former auditor and adjuster with the warranty department at Kia's Irvine, California corporate offices stated that he warned Kia, after discovering in August or September 2017, that faulty repairs on engine recalls were causing engine fires. Vaughn discovered that Kia dealerships performing engine recalls were improperly using "one-time use" components of the GDI system as part of the engine-replacement kits sent to dealers to repair the Engine Defect. Vaughn discovered that this improper usage resulted in an increased risk of GDI engine fires.[15] Further, Kia engine fires were reported to NHTSA even before that date.[16]

55.     To the extent that Kia did not know of the Engine Defect at the time of manufacture, Defendants clearly learned of the Engine Defect in certain GDI engines in 2015, and as early as 2011 when NHTSA consumer complaints were first logged. Defendants concealed the defect, minimized its cause, effects, and dangers, and failed to disclose or sufficiently remedy the defect. Even now, with NHTSA recalls pending, Defendants offer a repair that is almost certainly inadequate, and fails to include all models of affected vehicles, including those purchased by Plaintiffs.

56.     Plaintiffs also suffered damages as a result of the inadequate and dangerous recall repairs that were performed on their vehicles.

57.     Ultimately, Kia actively concealed the true character, quality, and nature of Plaintiffs' vehicles and their defective engines.

58.     Plaintiffs could not have reasonably been expected to learn or discover the true facts related to the dangerous Engine Defect in their vehicles at the time of purchasing

---

[15] Tariq Kamal, *Whistleblower: Kia Ignoring True Cause of Vehicle Fires*, (January 2, 2019) Auto Dealer Today,  https://www.autodealertodaymagazine.com/355399/whistleblower-kia-ignoring-true-cause-of-vehicle-fires  (last visited October 18, 2019).

[16] See e.g., NHTSA ID. No. 10914540, supra at ¶47 (2016 incident involving Kia Optima Hybrid)

their vehicles because the Defect was not disclosed then, or at any time thereafter, until recalls/reports, or until the manifestation of the Defect.

### C.    Estoppel

59.    Kia was, and currently is, under a continuous duty to disclose the true character, quality, and nature of their vehicles, including those purchased by Plaintiffs, any vehicle defect as alleged herein, and the inevitable repairs, replacements, expenses, time, and monetary damages resulting therefrom.

60.    Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

## VI

## CLAIMS FOR RELIEF

### COUNT I
### Violation of California False Advertising Law
### (Cal. Bus. & Prof. Code §  17500, *et seq*.)

61.    Plaintiffs incorporate by reference and re-allege all paragraphs previously stated herein.

62.    California Business & Professions Code § 17500 states: "It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

63.    Defendants caused to be made or disseminated through California and the United States—through advertising, marketing and other publications—statements that were untrue or misleading, and which were known, or which by the exercise of reasonable

care should have been known to Defendants, to be untrue and misleading to consumers, including Plaintiffs.

64.    Defendants violated section 17500 because the misrepresentations and omissions regarding the safety, reliability, and functionality of their vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

65.    Plaintiffs have suffered an injury in fact, including the loss of money or property, as a result of Defendants' unfair, unlawful, and/or deceptive practices. In purchasing their vehicles, Plaintiffs relied on the misrepresentations and/or omissions of Defendants with respect to the safety and reliability of the vehicles and believed that the vehicles were fit for the ordinary purposes for which they were sold. Defendants' representations and/or omissions were untrue because the vehicles are distributed with a defective engine. Had Plaintiffs known this, they would not have purchased their Kia vehicles, or they would not have paid as much for them. Accordingly, Plaintiffs overpaid for their vehicles, were greatly inconvenienced by the undisclosed defect,  and did not receive the benefit of their bargain.

66.    All the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' businesses. Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, in the states of California, Missouri and nationwide.

67.    Plaintiffs request that this Court enter such orders or judgments as necessary to enjoin Kia from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs any money Kia acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief permitted.

**COUNT II**
**Violation of California Unfair Competition Law Section 17200**
**(Cal. Bus. & Prof. Code §  17200, *et seq*.)**

68.    Plaintiffs incorporate by reference and re-allege all paragraphs previously stated herein.

69.    The California Unfair Competition Law ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

70.    Kia engaged in unfair competition and unfair, unlawful or fraudulent business practices through the conduct, statements, and omissions described herein, and by knowingly and intentionally concealing the Engine Defect from Plaintiffs. This is in addition to Kia concealing the risks, costs, monetary damage, diminished value of the Plaintiffs' vehicles and costly inconveniences resulting from the Engine Defect. Kia had a duty to disclose this information based on their superior position to know the true facts related to the Engine Defect, compared to that of Plaintiffs, who could not reasonably be expected to discover or learn the true facts related to the Engine Defect.

71.    The Engine Defect triggering inadequate engine oil lubrication that results in catastrophic engine failure, damage, and engine fires in Plaintiffs' vehicles constitutes a valid safety concern that triggered Defendants' duty to disclose the issue to consumers.

72.    Kia's acts and practices have deceived Plaintiffs and are likely to deceive the public. In failing to disclose the Engine Defect and concealing  material facts relevant to Plaintiffs' vehicles from Plaintiffs,  Kia breached their duty to disclose these facts, violated the UCL, and caused injuries to Plaintiffs. Defendants' omissions and concealment pertain to information that was material to Plaintiffs, as it would have been to all reasonable consumers.

73.    Plaintiffs' injuries are in no way greatly outweighed by any potential countervailing benefit to consumers or to competition, nor are these injuries such that Plaintiffs should have reasonably avoided them.

74.    Defendants' acts and practices are unlawful because they violate California Civil Code §§ 1668, 1709, 1710, and 17500, *et seq*., and California Commercial Code § 2313.

75.     Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Defendants, to obtain restitutionary disgorgement of all monies and revenues generated as a result of such practices, and all other relief allowed under California Business & Professions Code § 17200.

**COUNT III**
**Violation of the Song-Beverly Act–**
**Breach of Implied Warranty**
**(Cal. Civ. Code § 1791, *et seq*.)**

76.     Plaintiffs incorporates by reference and re-allege all paragraphs previously stated herein.

77.     Plaintiff Naomi Wilson's vehicle is a "consumer good" within the meaning of Cal. Civ. Code § 1791(a).

78.     Cal. Civ. Code § 1791.1(a) states: "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

(1) Pass without objection in the trade under the contract description.

(2) Are fit for the ordinary purposes for which such goods are used.

(3) Are adequately contained, packaged, and labeled.

(4) Conform to the promises or affirmations of fact made on the container or label.

79.     At all relevant times hereto, Kia was the manufacturer, distributor, warrantor, and/or seller of Plaintiff Wilson's vehicle. Kia knew or should have known the specific use for which the vehicles were purchased.

80.     Kia provided Plaintiff Wilson with an implied warranty that her vehicle, and any parts thereof, is merchantable and fit for the ordinary purpose for which it was sold. The vehicle, however, is not fit for their ordinary purpose because, *inter alia*, the vehicle and its engine contained an inherent defect at the time of sale that caused the vehicle to

experience premature and catastrophic engine failure and fire, which occurred in Plaintiff's vehicle

81.    Plaintiff's vehicle is not fit for the purpose of providing safe and reliable transportation because of the Engine Defect.

82.    Kia impliedly warranted that their vehicles were of merchantable quality and fit for such use. This implied warranty included, *inter alia*, the following: (i) a warranty that Plaintiff's vehicle and engine manufactured, supplied, distributed, and/or sold by Kia were safe and reliable for providing transportation and would not prematurely and catastrophically fail or catch fire; and (ii) a warranty that the vehicle and its engine would be fit for their intended use – providing safe and reliable transportation – while the vehicle were being operated.

83.    Contrary to the applicable implied warranties, Plaintiff's vehicle and its engine at the time of sale, and thereafter, were not fit for their ordinary and intended purpose. Instead, the vehicle is defective, including, but not limited to, the Engine Defect and/or manufacturing and widespread installation of the MPI engines.

84.    Kia's actions, as described herein, breached the implied warranty that Plaintiff's vehicle was of merchantable quality and fit for such use in violation of California Civil Code §§ 1792 and 1791.1.

85.    Under Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiff Wilson is entitled to damages and other legal and equitable relief including, but not limited to the purchase price of her vehicles or the overpayment or diminution in value of the vehicle, and attorney fees and costs.

## COUNT IV
### Violation of Missouri Merchandising Practices Act
### (Mo. Rev. Stat. § 407.010, *et seq.*)

86.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Amended Complaint.

87.     Plaintiff Kyle Swarts and Defendants are "persons" within the meaning of Mo. Rev. Stat. § 407.010(5).

88.     Kia engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

89.     The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise Mo. Rev. Stat. § 407.020.

90.     In the course of their business, Kia failed to disclose and actively concealed the dangers and associated risks posed by the Engine Defect as described herein and otherwise engaged in activities with a tendency or capacity to deceive, in violation of the Missouri MPA.

91.     By failing to disclose the Engine Defect or facts about the defect described herein known to Kia or that were available to them upon reasonable inquiry, Kia deprived consumers of all material facts about the safety and functionality of their vehicles. By failing to release material facts about the Engine Defect, Kia curtailed or reduced the ability of consumers to take notice of material facts about their vehicle, and/or it affirmatively operated to hide or keep those facts from consumers. 15 Mo. Code of State Reg. § 60-9.110,

92.     Moreover, Kia has otherwise engaged in activities with a tendency or capacity to deceive. Kia also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, unfair practices, and/or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of its vehicles with Engine Defects, despite their knowledge of the Defect and/or failure to adequately investigate it.

93.     In the course of their business, and in order to ensure that consumers would purchase their Vehicles, Kia deliberately withheld information about the propensity of the Engine Defect to cause spontaneous engine fires, engine stalls while in motion, premature engine wear, and a variety of other complications, instead of addressing the Engine Defect to ensure the safety of its vehicles, consumers and vehicle occupants.

94.     Defendants' omissions were material to Plaintiff Kyle Swarts. When Plaintiff Swarts purchased his vehicle, he reasonably relied on the expectation that the vehicle would not pose an unavoidable safety risk and believed that the vehicle was fit for the ordinary purposes for which it was sold. Had Defendants disclosed the Engine Defect, Plaintiff Swarts would not have purchased his vehicle, or would have paid less for it.

95.     As alleged above, Defendants knowingly concealed, suppressed and/or omitted the existence of the Engine Defect in Plaintiff Swarts's vehicle at the time of sale or lease and at all relevant times thereafter. Consequently, the failure to disclose such facts amounts to misleading statements pursuant to 15 Mo. Code of State Reg. § 60-9.090.

96.     Kia's conduct as described herein is unethical, oppressive, or unscrupulous and/or it presented a risk of substantial injury to consumers. Such acts are unfair practices in violation of 15 Mo. Code of State Reg. 60-8.020.

97.     Defendants knew or should have known that their conduct violated the Missouri MPA.

98.     Defendants owed Plaintiff Swarts a duty to disclose the dangerous and risky nature of the Engine Defect and ineffective recall repairs. The information surrounding the risks posed by the Engine Defect could not have reasonably been known by consumers.

99.     Defendants engaged in unconscionable, unfair, and deceptive trade practices as defined and construed under the Missouri MPA when they knew or recklessly disregarded the fact that their representations were false, as they were aware of the Engine Defect in certain GDI engines as early as 2011.

100.     Defendants engaged in unconscionable, unfair, and deceptive trade practices as defined and construed under the Missouri MPA when they failed to disclose to Plaintiff

Swarts the existence of an Engine Defect, that Engine Defect recalls— and repairs resulting therefrom—were wholly inadequate, and Plaintiff's vehicle still faced a risk of engine fire and catastrophic engine failure.

101.   As a direct and proximate result of the Defendants' violations of the Missouri MPA, Plaintiff Kyle Swarts suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' concealment and failure to disclose material information. Plaintiff Swarts would not have purchased his Soul at all and/or—if the vehicle's true nature had been disclosed and mitigated, and the engine rendered safe— would have paid significantly less for it. Plaintiff Swarts also suffered diminished value of his vehicle, as well as lost or diminished use following engine fires and catastrophic engine failure.

102.   Kia had an ongoing duty to all their customers to refrain from unfair and deceptive practices under the Missouri MPA. Plaintiff Swarts suffered ascertainable loss in the form of the diminished value of his vehicle as a result of Kia's unfair acts and practices made in the course of business.

103.   Kia's unlawful acts and practices complained of herein affect the public interest and present a continuing risk to Plaintiff Swarts, as well as to the general public, due to the risks of catastrophic engine failure engine fires on public roadways.

104.   Kia is liable to Plaintiff Swarts for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining Kia's unfair and deceptive practices, and any other relief the Court deems proper under Mo. Rev. Stat. § 407.025.

## COUNT V
## Breach of Implied Warranty

105.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

106.    Defendants were at all relevant times the manufacturer, distributor, warrantor, and/or seller of Plaintiffs' Vehicles. Defendants knew or had reason to know of the specific use for which the vehicles were purchased.

107.    Kia provided Plaintiffs with an implied warranty that their vehicles and any parts thereof are merchantable and fit for the ordinary purposes for which they were sold. However, the vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because, *inter alia*, the vehicles and their engines suffer from an Engine Defect at the time of sale that causes the vehicles to experience premature and catastrophic engine failure and spontaneous engine fires. Therefore, Plaintiffs' vehicles are not fit for their particular purpose of providing safe and reliable transportation for consumers.

108.    Kia impliedly warranted that Plaintiffs' vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the vehicles and their engines were manufactured, supplied, distributed, and/or sold by Kia were safe and reliable for providing transportation and would not experience premature and catastrophic engine failure; and (ii) a warranty that the vehicles and their engines would be fit for their intended use while being operated.

109.    Contrary to the applicable implied warranties, Plaintiff's engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs with reliable, durable, and safe transportation. Instead, the vehicles suffer from an Engine Defect putting at risk Plaintiffs and members of the public on the roadways.

110.    Defendant's actions, as complained of herein, breached the implied warranty that Plaintiffs' vehicles were of merchantable quality and fit ordinary use.

# VII
# PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Kia as follows:

1. Damages under the aforesaid causes of action for actual, compensatory, general, special, incidental, statutory, punitive, and

consequential damages, costs, and disgorgement in an amount to be
determined at trial;

2. An order requiring Defendants to pay both pre and post judgment
interest on any amounts awarded to the extent allowed by law;

3. An award of reasonable attorney's fees and costs of suit incurred
herein;

4. Any further relief as the Court deems appropriate.

## VIII

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury for all issues so triable.

**DATED: August 18, 2021.**                    **Respectfully submitted,**

MᴄCᴜɴᴇ Wʀɪɢʜᴛ Aʀᴇᴠᴀʟᴏ, LLP

*/s/ David C. Wright*

Richard D. McCune (State Bar No. 132124)
David C. Wright (State Bar No. 177468)
Mark I. Richards (State Bar No. 321252)
MᴄCᴜɴᴇ Wʀɪɢʜᴛ Aʀᴇᴠᴀʟᴏ, LLP
3281 East Guasti Road, Suite 100
Ontario, California 91761
Telephone: (909) 557-1250
Facsimile: (909) 557-1275
rdm@mccunewright.com
dcw@mccunewright.com
mir@mccunewright.com

Derek Y. Brandt (*Pro Hac Vice*)
Leigh M. Perica (*Pro Hac Vice*)
MᴄCᴜɴᴇ Wʀɪɢʜᴛ Aʀᴇᴠᴀʟᴏ, LLP
231 North Main Street, Suite 20
Edwardsville, IL 62025

T: (618) 307-6116
dyb@mccunewright.com
lmp@mccunewright.com

**Attorneys for Plaintiffs**

SECOND AMENDED COMPLAINT

## CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2021, I electronically filed the foregoing ***Second Amended Complaint*** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record in this action.

*/s/ David C. Wright*